Denise M. HAIRSTON, o/b/o
S.N.,[1] Plaintiff,

v.

**COMMISSIONER OF SOCIAL
SECURITY, Defendant.**

No. 13cv3325–FM.

United States District Court,
S.D. New York.

Signed Oct. 14, 2014.

---

1. The *pro se* complaint in this action contained the full name of the minor on whose behalf it is brought. As required by Rule 5.2(a) of the Federal Rules of Civil Procedure, I have substituted S.N.'s initials for her full name.

Denise M. Hairston, New York, NY, pro se.

Fergus John Kaiser, U.S. Social Security Administration, John E. Gura, Jr., David Stuart Jones, New York, NY, for Defendant.

### MEMORANDUM DECISION

FRANK MAAS, United States Magistrate Judge.

*Pro se* plaintiff Denise M. Hairston ("Hairston") brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), as amended, 42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying the application of her minor daughter, S.N., for Supplemental Security Income ("SSI") benefits. The parties have consented to my exercise of jurisdiction over the case for all purposes pursuant to 28 U.S.C. § 636(c). (ECF No. 32).

The Commissioner has moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (ECF No. 33). Although the motion is unopposed, a careful review of the record shows that it must be denied. Accordingly, as I previously indicated in an order dated September 29, 2014, (ECF No. 37), this case will be remanded to the Commissioner for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g).

### I. *Background*

#### A. *Procedural History*

On January 24, 2012, Hairston protectively filed an application for SSI benefits

on behalf of S.N., alleging that S.N. became disabled on January 5, 2011. (Tr. 90–98).[2] The application was denied initially on April 13, 2012. (*Id.* at 55). Hairston then requested a *de novo* hearing before an Administrative Law Judge ("ALJ"), which was held before ALJ Wallace Tannenbaum on December 13, 2012. (*See id.* at 31–54, 56–58). Hairston and S.N. both appeared at the hearing and testified without the assistance of an attorney or other representative. (*Id.* at 9, 32). Medical expert Dr. Matilda B. Brust also was present and testified. (*Id.* at 32). On November 26, 2012, the ALJ issued a decision denying S.N.'s application for SSI benefits. (*Id.* at 6–26). That ruling became the final decision of the Commissioner on May 6, 2013, after the Appeals Council denied Hairston's request for review. (*Id.* at 1–5). Hairston then timely commenced this action on May 15, 2013. (ECF No. 2).

After the Commissioner filed her motion on June 16, 2014, Hairston's opposition papers were due by July 16, 2014. (ECF Nos. 28, 33). Despite the passage of more than two additional months, Hairston has not responded to the motion; the motion is therefore deemed fully submitted.

### B. *Relevant Facts*

#### 1. *Non–Medical Evidence*

##### a. *Testimonial Evidence*

S.N. testified that she was born on June 18, 1997, making her fifteen years old at the time of the hearing. (Tr. at 35). She lived with her mother, Hairston, in an apartment in Manhattan. (*Id.* at 34). S.N. was in the ninth grade at the Urban Assembly for Young Women in Business.

(*Id.* at 35–36). She described herself as a "[p]retty good student" who aspired to join the military. (*Id.* at 36, 42). After school, S.N. was required to participate in an a program she identified by the acronym "CASES," which made a guidance counselor and group therapy available to her because she had gotten into "trouble with the law." (*Id.* at 37–40, 44–45).[3]

S.N. testified that she used a computer, enjoyed reading and music, and socialized with friends. (*Id.* at 39–40). In response to a question posed to her by Dr. Brust, S.N. admitted to having been "involved" with marijuana, but denied any involvement with alcohol or other drugs. (*Id.* at 50–51). S.N. indicated that she was not seeing a therapist or psychiatrist at the time of the hearing, but was receiving medical treatment for migraines. (*Id.* at 41). S.N. claimed that she had suffered from migraines for "some period" and that the medication she was receiving for her migraines failed to alleviate her pain. (*Id.* at 41–42).

During her own testimony, Hairston acknowledged that S.N. was a good student who had a full social life. (*Id.* at 43, 46–47). Hairston testified, however, that S.N. suffered from "debilitating" migraines. (*Id.* at 48). Hairston also disclosed that on April 29, 2012, S.N. had been raped by a stranger. (*Id.* at 45). As a consequence of this incident, S.N. was participating in a mental health treatment program which included weekly home visits by a social worker. (*Id.* at 45–46). Hairston described this program as "the highest level of home care that you can get," and stated that it was intended to "keep [S.N.] in [the] house rather than commit her mentally" due to her "severe depression." (*Id.*

---

**2.** "Tr." refers to the certified copy of the administrative record filed by the Commissioner as part of the Answer. (ECF No. 14).

**3.** It appears that S.N. had been arrested after hitting a woman and taking her cellphone. (*Id.* at 277).

at 52). Hairston concluded her testimony by indicating her belief that her daughter was "not functioning properly." (*Id.* at 53).

### b. *School Records*

On February 27 and March 12, 2006, approximately six years prior to Hairston's application for SSI benefits on behalf of S.N., S.N. underwent a psycho-educational evaluation with school psychologist Odette Martinez based on a "parental request." (*Id.* at 192). At the time of the evaluation, S.N. was eight years old and in the third grade. (*Id.*). The purpose of the evaluation was to "determine the suitability of special education services and/or appropriate educational placement." (*Id.*). As part of the evaluation, Martinez conferred with S.N.'s classroom teacher, Ms. Chau, who reported "some concerns" relating to S.N.'s "academic abilities and emotional issues," but also described S.N. as "highly verbal" and "well liked by her peers." (*Id.*). Chau noted that S.N. had difficulties with reading comprehension, decoding, math problem-solving, spelling, and organizing and planning writing projects. (*Id.*). Chau also expressed concern with S.N.'s "tardiness and attendance," and found her organizational and planning skills not age-appropriate. (*Id.* at 192, 197).

Martinez observed S.N. to be "friendly and socially related." (*Id.* at 193). S.N.'s eye contact was "adequate" and she "smiled and engaged in social conversation" during the observation period, even making several jokes. (*Id.*). S.N.'s attention and concentration were "constant with all tasks," and she needed "little redirection." (*Id.*). Her verbal responses were age-appropriate, and she generally complied with all test directions. (*Id.*). Martinez administered a number of assessment tests, including the Wechsler Intelligence Scale for Children–Fourth Edition ("WISC IV"), and the Wechsler Individual Achievement Test ("WIAT II"). (*Id.*) Martinez described S.N.'s WISC IV scores as "average" for perceptual reasoning and processing speed, and "high average" for verbal comprehension and working memory, thus giving rise to an "average" full-scale score. (*Id.* at 193, 198). Martinez noted S.N.'s relatively low academic performance, and highlighted her weaknesses in the areas of reading and decoding. (*Id.*). Martinez apparently attributed these shortcomings to the fact that S.N. was "coping with internalized anxiety caused by demands and challenges of h[er] environment (school and home)." (*See id.* at 198).

During this same period, on March 3, 2006, psychologist Ellen M. Armitage conducted a "classroom structured observation" of S.N., based on Hairston's concerns regarding S.N.'s academic progress. (*Id.* at 199). Armitage described S.N. as "fully engaged with the class activities" in her third-grade general education classroom. (*Id.*). Three months later, on June 5, 2006, speech language pathologist Sherry Bell of RCM Technologies conducted a speech and language evaluation of S.N. (*Id.* at 187–91). Bell found S.N. to be "an alert, cooperative girl with a good attention span and motivation to perform well." (*Id.* at 187). S.N.'s response time on tests was "within normal limits" and she generally was able to provide such personal information as her age, school, and grade. (*Id.* at 189). Her semantic skills were "in the [a]verage range" and she "seemed to enjoy communicating." (*Id.* at 189–90). Her "[c]onnected speech was organized, on topic and sequenced appropriately." (*Id.* at 190). Bell opined that S.N. had "more than adequate academic related auditory processing skills and expressive language skills." (*Id.*). Bell's report noted, however, that S.N. had been "held over." (*Id.* at 187).

On May 18, 2007, when S.N. was ten years old, the New York City Board of Education created an Individualized Education Program ("IEP") for her. (*See id.* at 176–86). The IEP recommended that S.N. be placed in a "collaborative team teaching" setting, with a staff ratio of twelve to one, and be afforded testing accommodations. (*Id.* at 176, 184). The IEP also noted that S.N. was "functioning slightly below grade level standards," and had difficulty organizing her thoughts. (*Id.* at 178). Nevertheless, S.N. was described as an "enthusiastic learner and a hard worker." (*Id.*). Her reading comprehension was average, she was able to answer "high level thinking questions," and she was able to work well "independently and in small groups." (*Id.*). The IEP noted that S.N. generally was in good health, but had asthma and allergies treated with medication. (*Id.* at 181).

On May 17, 2012, after Hairston filed S.N.'s application for SSI benefits, S.N.'s special education and resource room "teacher/coordinator," Mr. Ramirez, completed a teacher questionnaire for the New York State Office of Temporary and Disability Assistance. (*See id.* at 137–144). At the time, Mr. Ramirez had known S.N. for three years. (*Id.* at 137). In the questionnaire, Mr. Ramirez expressly disclaimed any "unusual degree of absenteeism" on the part of S.N. (*Id.* at 137, 143). Mr. Ramirez also was asked to respond to a series of questions concerning S.N.'s activities in five specific domains of function by indicating whether she had "no problem," "a slight problem," "an obvious problem," "a serious problem," or a "very serious problem" in accomplishing the activities in each domain. Mr. Ramirez reported that S.N. had some level of difficulty with respect to each of those domains. (*Id.* at 138–142). Nevertheless; Mr. Ramirez failed to provide any anecdotal information in the portions of the form that requested him to explain his assessments. (*See id.* at 138–42). His responses thus consist simply of circling numbers to indicate the level of problem he believed existed with regard to each activity.

In the domain of attending and completing tasks, Mr. Ramirez opined that S.N. had a "very serious problem" sustaining attention during play or sports activities and working at a reasonable pace, a "serious problem" carrying out multi-step instructions, and an "obvious problem" focusing long enough to finish an assigned activity or task. (*Id.* at 139). He believed that S.N. had a "slight problem" refocusing to a task when necessary, but "no problem" paying attention when spoken to directly, carrying out single-step instructions, waiting to take turns, changing from one activity to another without disruption, completing homework and class assignments, completing work accurately without careless mistakes, and working without distracting herself or others. (*Id.*).

In the domain of interacting and relating with others, Mr. Ramirez indicated that S.N. had a "very serious problem" playing cooperatively with other children, a "serious problem" making and keeping friends, and an "obvious problem" relating experiences, telling stories, and interpreting facial expressions, body language, hints, and sarcasm. (*Id.* at 140). He also indicated that S.N. had slight problems expressing anger appropriately and introducing and maintaining relevant and appropriate topics of conversation, but no problem seeking attention and asking permission appropriately, following classroom rules, respecting those in authority, using language appropriate to the situation and listener, taking turns in conversation, and using adequate vocabulary and grammar. (*Id.*).

In the domain of moving about and manipulating objects, Mr. Ramirez stated that S.N. had "very serious problems" in nearly all of the listed activities, including moving her body from place to place, manipulating objects, and demonstrating strength, coordination, and dexterity. (*Id.* at 141). The only activity for which Mr. Ramirez suggested that S.N. had less than a "very serious problem" was "[p]lanning, remembering, [or] executing controlled motor movements." As to those activities, he indicated that S.N. had only a "serious problem." (*Id.*).

In the domain of caring for herself, Mr. Ramirez indicated that S.N. had a "serious problem" caring for her physical needs such as dressing and eating, but a less than serious problem regarding all other activities. (*Id.* at 142). He indicated that she had no problem at all taking care of her personal hygiene and using good judgment regarding personal safety and dangerous circumstances. (*Id.*).

### c. *Child Function Report and Other Correspondence*

On January 24, 2012, as part of the application for S.N.'s SSI benefits, Hairston completed a Child Function Report. (*See id.* at 105–15). Hairston noted that although S.N. used eyeglasses, her vision was "[s]till blurry." (*Id.* at 108). Hairston further contended that S.N.'s daily activities were limited because her "severe migraines" kept her out of school. (*Id.* at 110). Although Hairston indicated that S.N. was able to perform all of the communication functions listed in the Function Report, such as answering the telephone and making calls, telling jokes and riddles accurately, asking for what she needed, and talking with friends and family, she also stated that "many of these abilities [we]re more limited" when S.N. was experiencing a migraine. (*Id.*). Hairston noted that S.N.'s progress in understanding and using what she had learned was not limited, and that S.N. did not have any limitations in her physical abilities. (*Id.* at 111). Hairston stated that S.N.'s impairments affected her social behavior, but indicated only that S.N. did not play team sports. (*Id.* at 112). Hairston also noted that S.N.'s ability to "pay attention and stick with a task" was limited, but did not specify any category of tasks that S.N. could not perform. (*Id.* at 114). Finally, Hairston said that S.N.'s ability to care for her own personal needs and safety was limited, but indicated only that S.N. did not take prescribed medications. Hairston did note, however, that S.N. cared for her own personal hygiene, washed and put away her own clothing, helped around the house, cooked for herself, arrived to school on time, studied and did her homework, used public transportation independently, accepted criticism and correction, stayed out of trouble, obeyed rules, avoided accidents, and asked for help when needed. (*Id.* at 113).

On February 9, 2012, with Hairston's assistance, S.N. answered a series of questions regarding the pain caused by her migraines ("Pain Questionnaire"). (*See id.* at 129–136).[4] The completed Pain Questionnaire indicates that S.N. first experienced migraines in 2009, and continued to receive treatment for those migraines from her treating physician, Dr. Benjamin, through 2012. Asked about the type of pain that she experienced during her migraines, S.N. answered "[i]t feels like a hammer is hitting my head." (*Id.* at 129). S.N. also described the pain as a "stabbing pain" with an intensity (presumably on a

---

4. Certain questions are answered in the first person (e.g., "the pain is located all over my head."). (*Id.* at 131). Others are clearly answered by Hairston (e.g., "[the medicine] made my daughter feel funny."). (*Id.* at 130).

ten-point scale) of nine. (*Id.* at 131). The frequency of the migraines was described as "sometimes everyday, sometimes once or twice a week," and lasting "all day." (*Id.* at 129–30). S.N. reported experiencing approximately fifteen migraines a month, or three per week. (*Id.* at 131). A "headache calendar" attached to the Pain Questionnaire indicates that S.N. had twelve migraines in January, and six headaches in the first half of February. (*Id.* at 135–36). The responses to the Pain Questionnaire indicate that the migraines affected all of S.N.'s daily activities, and resulted in numerous absences from school, including more than fifty in 2011. (*Id.* at 131, 133).

### 2. *Medical Evidence*

#### a. *Physical Condition*

##### i. *Treating Source*

S.N. treated with Dr. Taisha Benjamin of the William F. Ryan Community Center Network from at least February 2010 to June 2012. (*See id.* at 201–18, 283). During the first documented visit, on February 22, 2010, Dr. Benjamin noted that S.N. reported a history of migraines. She directed .that S.N. take four hundred milligrams of ibuprofen every six hours to treat her migraines and referred S.N. to a pediatric neurologist to identify the cause of her migraines. (*Id.* at 218). By November 10, 2010, S.N. was reporting that her migraines occurred twice per week, and that her prescribed medication provided "no relief." Dr. Benjamin's diagnosis was "[m]igraine, other, without mention of intractable migraine." (*Id.* at 210). Over the course of her treatment of S.N., Dr. Benjamin also prescribed two daily five hundred milligram tablets of Naprosyn [5] and eventually increased her dosage of

Ibuprofen to eight hundred milligrams every six hours. (*Id.* at 204, 210). Nonetheless, Dr. Benjamin noted several times that S.N.'s migraines were not "intractable." (*Id.* at 204, 210). During an appointment on November 10, 2010, S.N. reported that the migraines occurred twice per week, and that the prescribed medication provided "no relief." (*Id.* at 209).

During an appointment on May 7, 2010, Dr. Benjamin assessed S.N. with obesity. (*Id.* at 216). Dr. Benjamin's assessment of obesity continued throughout her treatment of S.N., although there were signs of improvement. (*See id.* 203–16). For example, on May 23, 2011, S.N. visited Dr. Benjamin for a weight check which revealed that S.N. had lost eight pounds since her previous visit in March 2011. (*Id.* at 205).

On October 26, 2010, Dr. Benjamin completed a "Learning Assessment Form" for S.N., noting that S.N. had no barriers to learning. (*Id.* at 211). During a subsequent visit on December 3, 2011, S.N. reported having friends and being "happy living at home," and she denied feeling depressed. (*Id.* at 203).

The final recorded visit with Dr. Benjamin occurred on June 5, 2012, approximately two months after S.N. was raped. (*Id.* at 279–83). That day, Dr. Benjamin drafted a letter explaining that as a result of a "traumatic incident" that had occurred, S.N. was taking three different antiretroviral medications with possible side effects of headaches, nausea, abdominal pain, and vomiting. (*Id.* at 283). S.N. specifically reported vomiting and headaches after taking the medications. (*Id.*).

---

**5.** "Naprosyn is a trademarked version of naproxen, which is an anti-inflammatory drug used to treat pain, inflammation, and osteoar-

thritis." *Dorland's Illustrated Medical Dictionary* 1251 (31st ed.2007).

### ii. Consultative Source

On March 13, 2012, seven months prior to the administrative hearing, Dr. Irene Chow conducted a consultative pediatric examination of S.N. (*Id.* at 253–59). The medical history provided to Dr. Chow by Hairston and S.N. indicated that S.N. had a history of migraine headaches, localized to her forehead, that dated back to when she was ten years old. S.N. described these migraines as "hammering," with an intensity of "9 [out of] 10." (*Id.* at 253). The headaches occurred at "any time" and would last for a full day. (*Id.*). S.N. stated that she treated these headaches with 800 milligrams of Ibuprofen, which would "put her to sleep for three to four hours." (*Id.*). S.N. had never been hospitalized for her headaches, but her mother had taken her to the emergency room for a "pain shot" numerous times during the first year that S.N. experienced the headaches. (*Id.*). Hairston explained that S.N. had been to a neurologist in recent years, and that an MRI taken in January 2011 was negative. (*Id.*). Hairston also noted that S.N. had missed fifty-six days of school in 2011 and approximately three weeks of school in the first three months of 2012; she also estimated that S.N. generally would miss ten days of school per month as a result of the migraines. (*Id.*). S.N. was in the ninth grade, where she was "doing fair." (*Id.* at 255). S.N. had a history of depression dating back to 2011, and was seeing a psychiatrist, but was not taking any medication. (*Id.* at 254). Dr. Chow's report lists "watch[ing] television, listen[ing] to music, play[ing] with … siblings, do[ing] homework, do[ing] chores, read[ing]," and "play[ing] by herself … [and] with friends," as S.N.'s typical daily activities. (*Id.* at 255).

Dr. Chow's physical examination revealed that S.N. was in the 75th percentile for height, but the 97th percentile for weight, for her age. (*Id.* at 255). Despite this finding, Dr. Chow described S.N.'s general appearance as "normal for her age." (*Id.* at 256). S.N. related to Dr. Chow in an "age-appropriate way," and her attention span also was normal for her age. (*Id.*). S.N. walked "with both of her feet pointed inward (in-toeing)" but denied having any difficulty walking. (*Id.*). Indeed, S.N. walked at a "reasonable pace" and could walk on her heels and toes. (*Id.*). S.N.'s lungs were clear and her chest movements were normal. (*Id.* at 257). Although S.N. had the onset of asthma when she was ten years old, she did not report any asthma attacks since that time. (*Id.* at 254). S.N. also complained of a "pulling" pain in her shoulder with an intensity of "6 [out of] 10" for three days leading up to Dr. Chow's examination, and informed Dr. Chow that she planned to see a doctor. (*Id.*). Nevertheless, S.N.'s fine motor activity and ability to handle large and small objects were age-appropriate. (*Id.*). S.N.'s neurologic reflexes also were normal and age-appropriate. (*Id.*).

Dr. Chow diagnosed S.N. with migraine headaches and obesity; she also noted a past left elbow fracture, a recent onset of right shoulder pain, and a history of ear and urinary tract infections. (*Id.* at 258). Dr. Chow concluded that S.N. should continue to see her pediatrician or neurologist to address the migraine headaches.[6] (*Id.*).

### b. Mental Condition

#### i. Treating Sources

##### a. Beth Israel Medical Center

On December 19, 2011, S.N. was admitted to the Department of Emergency Med-

---

**6.** Dr. Chow also noted that S.N. should continue seeing her psychiatrist to address her depression. (*Id.*).

icine at Beth Israel Medical Center ("Beth Israel") after she attempted to commit suicide by taking approximately thirty Ibuprofen, Aleve, and Naprosyn pills. (*Id.* at 221, 224). The Beth Israel Physician Documentation Sheet additionally notes that S.N. had two lacerations on her left wrist but that these lacerations did not cause bleeding. (*Id.* at 221). S.N. denied having previous suicidal behavior, and attributed her attempt to an ongoing conflict with her mother. (*Id.*). S.N. received treatment and a psychiatric consultation. (*Id.* at 223–24). The consulting resident assessed S.N. as suffering from depression not otherwise specified ("NOS"), and assigned her a GAF score of 40.[7] (*Id.* at 245). An attending psychiatrist further diagnosed S.N. with impulse control disorder NOS. (*See id.* at 238). S.N. was discharged on December 23, 2011. (*Id.* at 234).

### b. *Postgraduate Center for Mental Health*

S.N. began receiving mental health treatment through the Postgraduate Center for Mental Health ("PCMH") in February 2012. (*Id.* at 284). On June 5, 2012, S.N.'s case manager, Priscilla Ray, MPA wrote a letter to the Family Court in New York County explaining that S.N. was participating in PCMH's Blended Case Management program and was receiving "Intensive Case Management" ("ICM") services to assist her in the community. (*Id.*). Ray also indicated that the ICM services would "apply for Home and Community Based Waiver Program due to increased need." (*Id.*). Exactly what this entailed is not explained.

Additionally, someone at PCMH completed, but failed to sign, a mental health questionnaire that was submitted to the New York State Office of Temporary and Disability Assistance, Division of Disability Determinations. (*Id.* at 272–78). As the ALJ noted, the identity of this individual is unknown and the form is undated. (*Id.* at 15, 278). In any event, the form indicates that S.N. had participated in three "intake" sessions and two "family" sessions with practitioners at PCMH. (*Id.* at 273, 275). S.N. "walked out" of one of those sessions, however, because she was "angry at [the] therapist." (*Id.* at 275). The unknown respondent described S.N. as "bright" and having "no past psychiatric" history. (*Id.* at 273–74). Her behavior was described as age-appropriate with respect to her fine and gross motor skills, sensory abilities, communication skills, cognitive skills, and social and emotional skills. (*Id.*). Her attention, concentration, and memory all were "good," and her insight and judgment were "adequate." (*Id.* at 276). The respondent described S.N.'s "presenting problem" as living "in an extremely stressful situation" involving conflict with her mother and pressures emanating from her relationships with her siblings. (*Id.* 275). S.N. was not going to school regularly, but had ceased presenting any suicidal features after treatment. (*Id.* at 277).

### ii. *Consultative Sources*

#### a. *Dr. Carol Wiener*

On March 13, 2012, Dr. Carol Wiener conducted a consultative child psychiatric

---

**7.** The GAF scale was a numeric scale ranging from 0 to 100 that clinicians would use to rate a patient's social, occupational, and psychological functioning. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text rev. 2000) ("DSM–IV–TR"). The scale was introduced in the revised version of the DSM's third edition, *id.* at 12 (3d ed., rev.1987), but was removed from the most recent edition, which was released in 2013, *id.* at 16 (5th ed. 2013) ("DSM–5"). A GAF score of 40 indicated "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." DSM–IV–TR at 34.

evaluation of S.N. (*See id.* at 261–64). Dr. Wiener noted that Hairston "served as an informant for th[e] evaluation." (*Id.* at 261). According to Hairston, S.N. had been hospitalized at Beth Israel Hospital for a week in December 2011 for psychiatric care. (*Id.*). While S.N. was in the process of securing a therapist from Beth Israel for outpatient care, she also was "under the auspices" of PCMH, through which she was receiving weekly home visits from a social worker. (*Id.*). Hairston also reported that S.N. had a history of migraine headaches. (*Id.*).

S.N.'s behavioral symptoms included arguing with adults "at times," refusing to comply with requests, and talking a lot at school. (*Id.*). Dr. Wiener noted that S.N. previously had run away from home and was "truant from school." (*Id.*). S.N. had depressed moods, but denied suicidal ideation, anxiety, and obsessive or compulsive thoughts. (*Id.*). Dr. Wiener described S.N. as "cooperative" during the evaluation, and indicated that she "related in an age-appropriate manner." (*Id.* at 262). S.N. was neatly dressed and "well groomed." Her eye contact was appropriate, and her thought processes were "[c]oherent and goal directed." Her affect "[a]ppeared to be of full range and appropriate," and her mood was "neutral." S.N.'s attention, concentration, and recent and remote memory skills "[a]ppeared intact and age appropriate," and she was "able to perform simple calculations," as well as recall three out of three objects both "immediately" and after five minutes. Dr. Wiener estimated that S.N.'s intellectual functioning was "in the average range" and opined that her fund of information was appropriate to her age. (*Id.* at 263). Her insight "[s]eemed fair," while her judgment was "poor to fair due to adolescence." S.N. reported being able to "dress, bathe, and groom herself independently," and assist with chores in the home, such as "cleaning and washing the dishes." She also liked to "hang out with friends" but had "no particular hobbies." (*Id.*).

Dr. Wiener believed that S.N. was "able to attend to, follow, and understand age-appropriate directions and complete age-appropriate tasks," and generally would be able to "maintain appropriate social behavior." (*Id.*). Dr. Wiener opined that S.N. "may have some difficulty responding to changes in her environment," but was "generally able to learn" and to "ask questions and request assistance." (*Id.*). S.N. seemed "generally able to interact with peers." (*Id.*).

Dr. Wiener's diagnosis was depressive disorder NOS, with the need to rule out oppositional defiant disorder. She recommended that S.N. continue with her current treatments and educational placement, and opined that family therapy could be "helpful." (*Id.* at 264). In Dr. Wiener's view, S.N.'s prognosis was "guarded to fair, given her oppositional behavior, but seeming cognitive abilities." (*Id.*).

b. *L. Blackwell and Dr. Puttanniah*

On April 10, 2012, L. Blackwell, a state agency psychology consultant, completed a Childhood Disability Evaluation Form regarding S.N.'s impairments and limitations. (*See id.* at 285–90). The following day, Dr. M. Puttanniah, a state agency pediatrics consultant, also signed the form. (*Id.* at 286). Blackwell and Dr. Puttanniah concluded that S.N. suffered from migraines and depressive disorder NOS, but that these impairments did not meet or medically equal any of the Listings. (*Id.* at 285). Turning to functional equivalence, Blackwell and Dr. Puttanniah found that S.N. had no limitations in the domains of acquiring and using information, attending and completing tasks, and moving about and manipulating objects. In support of

their conclusion with respect to the domain of acquiring and using information, the two noted S.N.'s scores on the diagnostic tests administered by Martinez, as well as the fact that S.N. had been placed in a regular education setting, where she was "working at or near grade level in all subjects." (*Id.* at 287). With regard to the other two domains, the two simply indicated that S.N. had "no deficits." (*Id.* at 287–88). Blackwell and Dr. Puttanniah also concluded that S.N. had "less than marked" limitations in the domains of interacting and relating with others and health and physical well-being. (*Id.*). In support of their finding regarding interacting and relating with others, the two noted that S.N. related appropriately in the psychological consultative examination, and had friends with whom she socialized. (*Id.* at 287). In support of their finding with respect to S.N.'s health and physical well-being, they noted S.N.'s history of migraine headaches and asthma, as well as the findings of Dr. Chow's pediatric consultative examination. (*Id.* at 288). Blackwell and Dr. Puttanniah found that S.N. had a "marked" limitation in the domain of caring for herself, noting her 2011 hospitalization after her suicide attempt, as well as her ongoing depression. (*Id.*). Ultimately, they concluded that while S.N.'s impairments were severe, they did not meet or medically or functionally equal the Listings. (*Id.* at 289).

### c. *Dr. Brust's Administrative Hearing Testimony*

Dr. Brust, a board certified pediatrician specializing in children with physical and emotional problems, testified at the administrative hearing as a medical expert. (*See id.* at 48–52). After reviewing the medical evidence provided to her by ALJ Tannenbaum, Dr. Brust noted that it was difficult to glean a "complete picture" because the record lacked any reports by a treating psychiatrist or therapist. Dr. Brust never-theless testified that S.N. was a "very bright young lady" who had a "long history of problems," and a "very strong family history of psychiatric problems." (*Id.* at 49–50). Dr. Brust explained that following her suicide attempt, S.N. was hospitalized psychiatrically for approximately one week beginning on December 19, 2011. (*Id.* at 49). Dr. Brust also referenced S.N.'s "long history of migraines," which she associated with "problem[s] with going to school," and which on occasion required home tutoring. (*Id.* at 50).

Notwithstanding these findings, based on S.N.'s hearing testimony, her daily activities, and the medical evidence, Dr. Brust concluded that there was no evidence to suggest that S.N.'s limitations met or equaled a relevant listing. (*Id.* at 52). Dr. Brust further concluded that was no evidence to suggest that S.N. had any "functional limitations which would preclude age appropriate activities." (*Id.* at 51–52).

### 3. *ALJ's Decision*

In his decision, dated November 26, 2012, the ALJ found that S.N. was not disabled within the meaning of the Act and therefore denied her application for SSI benefits. (*See id.* at 9–23). In reaching that conclusion, the ALJ applied the three-step analytical framework required to determine a child's eligibility for SSI benefits. *See* 20 C.F.R. § 416.924.

At the first step, the ALJ determined that S.N. was an "adolescent" who had not engaged in substantial gainful activity since January 5, 2012, the date she applied for SSI. (Tr. at 12).

At the second step, the ALJ found that S.N.'s rule out oppositional defiant disorder, impulse control disorder NOS, depressive disorder NOS, migraine headaches, and obesity all caused more than minimal functional limitations, and therefore qualified as "severe" impairments. (*Id.*).

At the third step, the ALJ determined that S.N. did not suffer from an impairment or combination of impairments that met or medically equaled any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1"). (*Id.*). In reaching this conclusion, the ALJ indicated that he had specifically considered Listings 112.04 pertaining to mood disorders, 112.06 pertaining to anxiety disorders, and 112.11 pertaining to Attention Deficit Hyperactivity Disorder. (*Id.*). The ALJ's decision did not specifically discuss the reasoning underlying this finding, but cited instead to his discussion of the issue of functional equivalence. (*Id.*).

In a substantially longer portion of his opinion, the ALJ further determined that S.N. did not suffer from an impairment or combination of impairments that functionally equaled the criteria for any impairment listed in Appendix 1. (*Id.*). In doing so, the ALJ considered whether S.N. had marked or severe limitations in any of the six "functional equivalence domains" set forth in 20 C.F.R. § 416.926a. The ALJ noted that he had evaluated the "whole child" and had considered "all of the relevant evidence in the case record," as required by 20 C.F.R. §§ 416.924a(a) and 416.926a(b)-(c). (*Id.*).

In reaching his conclusions, ALJ Tannenbaum followed a two-step process. First, he determined whether S.N. had underlying medically-determinable impairments that one might reasonably expect could produce S.N.'s alleged limitations. Then, the ALJ evaluated the intensity, persistence, and limiting effects of S.N.'s symptoms to determine the extent to which they actually limited her functioning. Repeating what has become the mantra of virtually every ALJ in every social security case, the ALJ found that S.N.'s medically-determinable impairments could reasonably be expected to produce her alleged symptoms, but that statements regarding the intensity, persistence, and limiting effects of her migraines and depression were not entirely credible to the extent they were inconsistent with the finding that S.N. did not have an impairment or combination of impairments that functionally equaled the listings. (*See id.* at 13–14).

After making this credibility determination, the ALJ went on to analyze S.N.'s functioning within each of the functional domains, turning first to S.N.'s ability to "acquire and use information." The ALJ concluded that S.N. had no limitations in this domain. As he explained, in their Childhood Disability Evaluation completed in April 2012, Blackwell and Dr. Puttanniah cited to "multiple test results, which generally reveal[ed] average academic achievement." (*Id.* at 18). The ALJ also observed that S.N. attended school in a regular education classroom, that she did not receive any "special education services," and that her mother had testified that she was a "good student." (*Id.*). The ALJ also considered S.N.'s WISC IV and WIAT scores from 2006, which placed her in the "average range" for children her age. (*Id.*). The ALJ acknowledged that these test results were obtained well before S.N. sought SSI benefits, but indicated that they were nevertheless relevant when considering her "abilities for acquiring and using information." (*Id.*).

Turning to the domain of "attending and completing tasks," the ALJ again cited the Childhood Disability Evaluation, stating simply that "[t]he record [did] not support a finding of limitations in this domain." (*Id.* at 19). Similarly, with respect to S.N.'s ability to "move about and manipulate objects," the ALJ found, without further explanation, that there was no indication that S.N. had any impairments in this domain. (*Id.* at 20).

In assessing S.N.'s ability to "interact and relate with others," the ALJ emphasized Dr. Wiener's evaluation that S.N. had good peer and "mostly good" family relationships, "seem[ed] generally able to interact with peers," and was "sometimes" able to interact with adults adequately. (*Id.* at 19–20). Moreover, the ALJ cited Dr. Weiner's evaluation, the Childhood Disability Evaluation, and S.N.'s hearing testimony, as support for his conclusion that S.N. was cooperative while being examined and "related in an age-appropriate manner." (*Id.* at 19). Although the ALJ noted Dr. Weiner's assessment that S.N. was occasionally "disrespectful, rebellious, and moody," he nevertheless found that S.N. had "less than marked limitation[s]" in this domain. (*Id.*).

The ALJ next turned to S.N.'s "ability to care for herself." Relying primarily on S.N.'s 2011 suicide attempt, as well as her "unspecified legal troubles," and her weekly participation in the Home and Community Based Waiver Program "designed to assist children and adolescents who are seriously emotionally disturbed," the ALJ found that S.N. had a marked limitation in the "caring for yourself" domain. (*Id.* at 21).

Finally, the ALJ considered S.N.'s "health and physical well-being." He noted that S.N. had a "history of migraines," was experiencing side effects from taking antiretroviral medications which included headaches and vomiting, and had a history of asthma. (*Id.* at 22). The ALJ also observed that S.N. has not taken medicine or visited an emergency room because of her asthma since she was ten years old. (*Id.*). Without further explanation, the ALJ concluded that S.N. had less than marked limitations in this domain.

Having concluded that S.N. did not have an impairment or combination of impairments that resulted in marked limitations

in two domains, or an extreme limitation in any one of the six domains, the ALJ determined that her impairments did not functionally equal any of the impairments listed in Appendix 1. (*Id.*) Consequently, the ALJ concluded that S.N. was not disabled. (*Id.*).

### 4. *Evidence Submitted to the Appeals Council*

In connection with her appeal, S.N. submitted to the Appeals Council further evidence consisting of a letter from Dr. Hilary Younkin of "The New York Foundling." (*See id.* at 293). Dr. Younkin stated that she examined S.N. on March 4, 2013, and diagnosed her with Major Depressive Disorder. (*Id.* at 293). Dr. Younkin prescribed twenty milligrams of Prozac daily, and she opined that S.N. would "likely require treatment (psychotherapy and medication) for at least a year." (*Id.*).

## II. *Legal Standards*

### A. *Standard of Review*

■ Under Rule 12(c), judgment on the pleadings is appropriate when the material facts are undisputed and a party is entitled to judgment as a matter of law based on the contents of the pleadings. *See, e.g., Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988); *Carballo ex rel. Cortes v. Apfel,* 34 F.Supp.2d 208, 213–14 (S.D.N.Y.1999).

■ The Act, in turn, provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); *see Veino v. Barnhart,* 312 F.3d 578, 586 (2d Cir.2002); *Perez v. Chater,* 77 F.3d 41, 46 (2d Cir.1996). The term "substantial" does not require that the evidence be overwhelming, but it must be "more than a mere scintilla. It means such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)).

A district court is not permitted to review the Commissioner's decision *de novo. Halloran v. Barnhart,* 362 F.3d 28, 31 (2d Cir.2004) (citing *Schaal v. Apfel,* 134 F.3d 496, 501 (2d Cir.1998)); *Jones v. Sullivan,* 949 F.2d 57, 59 (2d Cir.1991). Rather, the court's inquiry is limited to ensuring that the Commissioner applied the correct legal standard and that his decision is supported by substantial evidence. *See Hickson v. Astrue,* No. CV–09–2049 (DLI)(JMA), 2011 WL 1099484, at *2 (E.D.N.Y. Mar. 22, 2011) (citing *Schaal,* 134 F.3d at 504). When the Commissioner's determination is supported by substantial evidence, the decision must be upheld, "even if there also is substantial evidence for the plaintiff's position." *Morillo v. Apfel,* 150 F.Supp.2d 540, 545 (S.D.N.Y.2001). This means that the ALJ's factual findings may be set aside only if a reasonable factfinder would have had to conclude otherwise. *Brault v. Soc. Sec. Admin., Comm'r,* 683 F.3d 443, 448 (2d Cir.2012).

B. *Disability Determination for Children*

To qualify as disabled under the Act, a child under the age of eighteen must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). The regulations set forth a three-step evaluation process for determining whether a child is disabled.

20 C.F.R. § 416.924; *see, e.g., Martinez v. Astrue,* No. 07 Civ. 3156(WHP)(GWG), 2008 WL 4178155, at *7 (S.D.N.Y. Sept. 8, 2008) (citing *Pollard v. Halter,* 377 F.3d 183, 189–90 (2d Cir.2004)). First, the ALJ must consider whether the child has engaged in work that constitutes "substantial gainful activity," as such activity would automatically exclude the child from benefits. 20 C.F.R. § 416.924(b). Second, the ALJ must determine whether the child suffers from at least one "severe" medically determinable impairment that causes "more than minimal functional limitations." *Id.* § 416.924(c). Third, if the ALJ finds a "severe" impairment, he must determine whether it is the medical or functional equivalent of an impairment listed in Appendix 1. *Id.* § 416.924(d).

To qualify as a listed impairment's functional equivalent, an impairment must cause "extreme" limitation in one or "marked" limitation in two of the six "domains" established by the regulations. *Id.* § 416.926a(a). These domains relate to: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for [one]self; and (6) health and physical well-being. *Id.* § 416.926a(b)(1). The regulations define a marked limitation as one that is "more than moderate," but "less than extreme," and which "seriously" interferes with a claimant's ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(2)(i). An extreme limitation, by comparison, must "very seriously" interfere with a claimant's ability to initiate, sustain, or complete activities independently. *Id.* § 416.926a(e)(3)(i). Although not necessarily indicative of a total loss of functioning, an "extreme" rating is given only to the "worst limitations." *Id.*

### C. *Waiver of Right to Counsel*

██ A claimant seeking Social Security benefits does not have a constitutional right to be represented by counsel during an administrative hearing before an ALJ. *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir.2009). Nonetheless, the Act affords a claimant such a statutory right. *Id.* (citing 42 U.S.C. § 406); *see also* 20 C.F.R. § 404.1705 (entitling claimant to attorney or non-attorney representative). The Commissioner must advise the claimant of this right, in writing, in advance of the hearing. 42 U.S.C. §§ 406(c), 1383(d)(2)(D). Furthermore, at the hearing, "the ALJ must ensure that the claimant is aware of [her] right [to counsel]." *Lamay*, 562 F.3d at 507 (quoting *Robinson v. Sec'y of Health Human Servs.*, 733 F.2d 255, 257 (2d Cir.1984)).

### III. *Application of Law to Facts*

#### A. *Disability Determination*

##### 1. *Step One*

The first step of the evaluation process requires the ALJ to determine whether the child has engaged in "substantial gainful activity" ("SGA") since the date she filed for benefits. 20 C.F.R. § 416.924(b). The ALJ found that S.N. had not engaged in SGA since January 5, 2012, and therefore proceeded to the next step of the analysis. (Tr. 12). This finding benefits S.N. and is consistent with S.N.'s testimony that she is a full time student. (*Id.* at 35).

##### 2. *Step Two*

The second step of the analysis requires the ALJ to determine whether the child suffers from one or more "severe" impairments. 20 C.F.R. § 416.924(c). The ALJ found, and the Commissioner does not dispute, that S.N. had several "severe" impairments within the meaning of the regulations, including impulse control disorder NOS, depressive disorder NOS, migraine headaches, and obesity. (Tr. 12). That conclusion finds substantial support in the record, including the consultative reports of Drs. Chow and Weiner, Dr. Benjamin's treatment records, and the medical records of the Beth Israel Medical Center. (*See id.* at 201–18, 220–32, 253–59, 261–64). In any event, because Step Two merely serves as a filter to screen out *de minimis* disability claims, a finding of any severe impairment suffices to satisfy its requirements. *Fortier v. Astrue*, No. 3:10cv01688 (MRK)(WIG), 2012 WL 3727178, at *9 (D.Conn.2012) (quoting *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir.1987)).

##### 3. *Step Three*

The third and final step of the analysis requires the ALJ to determine whether the child has an impairment or combination of impairments that meets or medically equals one of the impairments listed in Appendix 1. If the child does not have an impairment that meets or medically equals a listed impairment, the ALJ must further consider whether any of the child's impairments is the functional equivalent of a listed impairment. 20 C.F.R. § 416.924(d).

###### a. *Medical Equivalence*

██ In determining whether S.N.'s impairments met or medically equaled an impairment listed in Appendix 1, the ALJ considered Listings 112.04, 112.06, and 112.11. (Tr. 12). The ALJ did not provide a detailed discussion of those Listings, choosing to refer simply to his Step Three analysis to explain why S.N.'s impairments did not functionally equal the severity of the Listings. (*Id.*). The brevity of the ALJ's Step Two analysis does not, in and of itself, necessitate remand. As the Second Circuit has made clear, an ALJ need not spell out his analysis with great detail, as long as the Court can clearly discern that there is substantial evidence in the record to support his conclusion. *See Sal-*

*mini v. Comm'r of Soc. Sec.,* 371 Fed. Appx. 109, 112 (2d Cir.2010) (citing *Berry v. Schweiker,* 675 F.2d 464, 469 (2d Cir. 1982)); *Batista ex rel. M.B. v. Astrue,* No. 08–CV–2136 (DLI), 2010 WL 3924684, at *7–9 (E.D.N.Y. Sept. 29, 2010).

■ The mental disorders of children under the age of eighteen are addressed in Section 112.00 of Appendix 1. *See* Appendix 1 §§ 112.00–112.12. As the ALJ correctly observed, Listings potentially implicated by S.N.'s impairments were: (i) mood disorders "[c]haracterized by a disturbance of mood ... accompanied by a full or partial manic or depressive syndrome" (Section 112.04); (ii) anxiety disorders experienced when anxiety is the "predominant disturbance" (Section 112.06); and (iii) Attention Deficit Hyperactivity Disorder "[m]anifested by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity" (Section 112.11). There is substantial evidence in the record to support the ALJ's findings that S.N. did not have any impairments that medically equaled these Listings.

Each of the three Listings implicated by S.N.'s impairments requires medically-documented evidence that satisfies the criteria enumerated in both Paragraphs A and B of the Listing. Although each Listing sets forth unique Paragraph A criteria, the Paragraph B criteria are identical for all three Listings. Those Paragraph B criteria are satisfied when the child experiences at least two of the following: (i) "[m]arked impairment in age-appropriate cognitive/communicative function, documented by medical findings," (ii) "[m]arked impairment in age-appropriate social functioning, documented by history and medical findings," (iii) "[m]arked impairment in age-appropriate personal functioning, documented by history and medical findings," or (iv) "[m]arked difficulties in maintaining

concentration, persistence, or pace." *Id.* §§ 112.04(B), 112.06(B), 112.11(B).

■ Although S.N.'s obesity, which the ALJ identified as a severe impairment, does not correspond to a specific Listing, the ALJ was required to take it into account when determining whether a Listing-level impairment had been established. *See Polynice v. Colvin,* No. 8:12–CV–1381 (DNH)(ATB), 2013 WL 6086650, at *6 (N.D.N.Y. Nov. 19, 2013) ("Obesity is not in and of itself a 'disability,' but the Social Security Administration considers it to be a medically determinable impairment, the effects of which should be considered at the various steps of the evaluation process....") (citing SSR 02–1p (2002)). Additionally, while there is no specific Listing for migraine headaches, courts have taken them into account when considering enumerated Listings. *See Murray v. Colvin,* No. 13–CV–06051 (MAT), 2013 WL 6145769, at *5 (W.D.N.Y. Nov. 21, 2013) (considering claimant's migraine headaches in determining whether claimant's impairment met the criteria for Listing 12.04 (Adult Affective Disorders)); *Kwitschau v. Colvin,* No. 11 C 6900, 2013 WL 6049072, at *3 (N.D.Ill. Nov. 14, 2013) (comparing migraines to non-convulsive seizures under Listing 11.03).

Even if S.N.'s mental impairments satisfied the Paragraph A criteria of one or more of the relevant Listings, itself a dubious proposition, there is no evidence that S.N. had marked impairments or difficulties that would satisfy the Paragraph B requirements of the Listings. Indeed, S.N.'s attention, concentration and memory were "age appropriate," and Dr. Wiener concluded that her intellectual functioning was "in the average range." (Tr. 263). Additionally, S.N. was "able to attend to, follow, and understand age-appropriate directions and complete age-appropriate tasks," while "maintain[ing] appropriate

social behavior." (*Id.*). S.N. and Hairston also both acknowledged that S.N. was a good student with a full social life. (*Id.* at 42–43, 46–47). Hairston further acknowledged that S.N. was able to care for her own personal hygiene, wash and put away her own clothing, help around the house, cook for herself, arrive to school on time, study and do her homework, and use public transportation. Dr. Chow's report similarly indicated that S.N.'s daily activities included watching television, listening to music, playing with siblings and other friends, doing chores, and reading. (*Id.* at 113, 255). Finally, although the ALJ rightfully accorded the unsigned and undated PCMH questionnaire less weight, it too indicates that S.N. had "good" attention, concentration, memory, and age-appropriate cognitive skills, as well as age-appropriate fine and gross motor skills, sensory abilities, communication skills, cognitive skills, and social and emotional skills. (*Id.* at 276). In sum, the ALJ correctly concluded that S.N. did not have an impairment that medically equaled any of the listings in Appendix 1.

### b. *Functional Equivalence*

Having failed to satisfy the requirements of any Listing, S.N. could be considered disabled only if she had one or more impairments that were the functional equivalent of a listed impairment. 20 C.F.R. § 416.924(d). This, in turn, required her to establish that she had an "extreme" limitations in one or a "marked" limitation in two or more of the six domains set forth in 20 C.F.R. § 416.926a. ALJ Tannenbaum found that S.N. had a marked limitation in her ability to care for herself. (Tr. 20–21). Accordingly, a finding of a marked limitation in any other domain would have led to S.N. securing SSI benefits. Having reviewed the record at length, I conclude that the ALJ reached a correct determination with respect to

five of the six domains, but that his finding with respect to the domain of health and physical well-being does not withstand scrutiny.

In the domain of health and physical well-being the ALJ was required to consider the cumulative physical effects of S.N.'s physical and mental impairments, and their associated treatments or therapies, on her health and physical well-being. 20 C.F.R. § 416.926a(b)(1). This domain differs from the other domains in that a claimant is also considered to have a marked limitation if she is "frequently ill because of [her] impairment(s) or [has] frequent exacerbations of ... impairment(s) that result in significant, documented symptoms or signs." 20 C.F.R. § 416.926a(e)(2)(iv). The term frequent includes circumstances in which the claimant has "episodes of illnesses or exacerbations that occur on an average of [three] times a year, or once every [four] months, each lasting [two] weeks or more" or "*episodes that occur more often than [three] times in a year or once every [four] months [that] do not last for [two] weeks....*" *Id.* (emphasis added).

ALJ's Tannenbaum's most extensive discussion of S.N.'s migraines noted as follows:

> At the pediatric examination with Irene Chow, D.O., on March 13, 2012, claimant reports a history of migraine headaches since she was [ten] years old, localized to the forehead. Claimant states that the headaches are triggered by exposure to bright lights, and usually last all day. She takes ibuprofen twice a day as treatment and the only time she was at a hospital for a headache was when she was [ten] years old and went to the emergency room for pain shots. Claimant did see a neurologist within the past year and under[went] an MRI which was negative. Claimant reportedly

misses significant amounts of school due to these headaches.

(Tr. 13). Apart from a boilerplate statement that S.N. had "less than marked limitation in health and physical well-being," however, the ALJ has furnished no explanation why S.N.'s allegedly frequent absences from school due to migraine headaches did not give rise to a marked limitation in this domain. (*Id.* at 22).

 To be sure, an ALJ is not required to accept as credible a claimant's or parent's statements concerning the functional limitations of a minor child. *See Hickman–Smith ex rel. Watkins v. Astrue,* No. 07 Civ. 3985(GBD)(RLE), 2011 WL 1226361, at *7 (S.D.N.Y. March 2, 2011) (citing *Williams ex rel. Williams v. Bowen,* 859 F.2d 255, 260 (2d Cir.1988)). There was, however, considerable evidence before ALJ Tannenbaum suggesting that S.N.'s migraine headaches were frequent and debilitating. For example, both Hairston and S.N. testified to that effect.[8] (Tr. 41–42, 48). In addition, Dr. Chow also diagnosed S.N. with migraine headaches and recommended further medical attention for this condition. (*Id.* at 258). Fur-

ther, the ALJ accorded "great weight" to the testimony of Dr. Brust, the medical expert who testified at the hearing. (*Id.* at 16). However, even Dr. Brust took note of S.N.'s "long history of migraines," commenting that they had resulted in "problems with going to school" and had required some home tutoring. (*Id.* at 50). Finally, Dr. Benjamin, S.N.'s treating physician, treated S.N.'s migraines over a period of years, during which she increased her dosage of Ibuprofen and also prescribed Naprosyn. (*Id.* at 210).[9]

Resorting to boilerplate language that appears in many administrative decisions, ALJ Tannenbaum concluded that S.N.'s impairments could reasonably be expected to produce her alleged symptoms, but found further that her "statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not credible to the extant that they [were] inconsistent with the finding that the claimant [did] not have a impairment or combination of impairments that functionally equaled the [L]istings for the reasons explained below." (*Id.* at 13–14). In the ensuing discussion, however, the ALJ said

---

8. Hairston and S.N. also provided other information corroborating their testimony. Specifically, in the Child Function Report, Hairston indicated that S.N.'s migraines limited her daily activities because she had to miss school due to "severe migraines." (*Id.* at 110). Hairston also noted that S.N.'s ability to communicate was "more limited," when S.N. was experiencing a migraine. (*Id.*). In the Pain Questionnaire, Hairston and S.N. described S.N.'s pain as a "stabbing pain," with an intensity of nine out often. (*Id.* at 131). S.N. also reported that the pain would last all day. (*Id.* at 129–30). The frequency of the migraines was described as "sometimes everyday, sometimes once or twice a week," with S.N. reportedly experiencing approximately fifteen migraines a month, or about three per week. (*Id.* at 131). A headache calendar attached to the Pain Questionnaire suggested a similar frequency. (*Id.* at 135–36). Finally, S.N. reported more than fifty

absences from school in 2011, a number consistent with the information she provided to Dr. Chow. (*Id.* at 133, 253).

9. There also was evidence suggesting that Hairston's and S.N.'s claims regarding migraine headaches may have been overblown. As an example, an MRI taken in January 2011 reflected no abnormalities. (*Id.* at 253). Also, Mr. Ramirez. S.N.'s special education teacher, indicated that she was not frequently absent from school. (*Id.* at 137, 143). Nevertheless, in his decision, the ALJ indicated that he accorded "no weight" to Ramirez's assessment of S.N.'s functional capacities because they were "not accompanied by any explanation and [were] significantly inconsistent with the overwhelming evidence of record." (*Id.* at 17). It thus is unclear whether the ALJ accepted Mr. Ramirez's statements concerning S.N.'s attendance at school.

nothing about the conflicting evidence concerning the frequency of S.N.'s migraine headaches or their intensity. His finding that S.N. did not have a marked limitation in the domain of health and physical well-being is therefore *ipse dixit*. *See Estrada ex rel. E.E. v. Astrue*, No. 08–CV–3427, 2010 WL 3924686, at *6 (E.D.N.Y. Sept. 29, 2010) ("It is not sufficient for the adjudicator to make a single, conclusory statement that the individual's allegations have been considered or that the allegations are (or are not) credible.") (quoting SSR 96–7p (1996) (internal quotation marks omitted)).

In these circumstances, the Court can determine neither whether the ALJ applied the correct legal standard with respect to the health and physical well-being domain, nor whether his findings are supported by substantial evidence. A remand for further fact-finding consequently is necessary. *See, e.g., Dunaway v. Astrue*, 815 F.Supp.2d 624, 628 (W.D.N.Y.2011) (remand appropriate when evidence in the record supporting a finding of a marked impairment is "not discussed or reconciled by the ALJ"); *Villani v. Barnhart*, No. 05–CV–5503 (DRH), 2008 WL 2001879, at *11 (E.D.N.Y. May 8, 2008) (remand appropriate because ALJ found claimant's testimony not credible, but failed to explain which statements were found not credible and why); *Oliveras ex rel. Gonzalez v. Astrue*, No. 07 Civ. 2841(RMB)(JCF), 2008 WL 2262618, at *8 (S.D.N.Y. May 30, 2008) (remand appropriate where ALJ's analysis leaves "the reader to speculate as to which statements the ALJ accepted and which he rejected.").

Additionally, the Social Security regulations assure child claimants that the Commissioner will "ask for information from [their] parents and teachers, and may ask for information from others who see [them] often and can describe [their] functioning at home, in childcare, at school, and in [their] community." 20 C.F.R. § 416.926a(b)(3). Accordingly, on remand, the ALJ would be well-advised to contact S.N.'s school to obtain further records, including her attendance records, as part of his assessment of the health and physical well-being domain. The ALJ also may wish to contact Dr. Benjamin, S.N.'s treating physician, to explore further the degree of limitation caused by S.N.'s migraines. *See Oliveras*, 2008 WL 2262618, at *6–7 (remanding case even though the ALJ had the treating physician's medical records because the treating physician's opinion about a specific functional limitation might have been important evidence). Finally, on remand, the ALJ should specify which aspects of S.N.'s and Hairston's testimony he finds not credible and the reasons why.

### B. *Waiver of Representation*

█ It is clear that prior to the hearing, Hairston was adequately advised, in writing, of her right to be assisted at the hearing by an attorney or other representative. (Tr. 56, 65–66, 68–72, 75). At the hearing, however, the ALJ made no effort to ensure that Hairston understood this right and was knowingly waiving it. The failure to do so is particularly significant in this case, where a credible showing that S.N. suffered from frequent debilitating migraine headaches might have entitled her to a virtually automatic finding of disability. On remand, the ALJ should therefore take care to establish that Hairston and S.N. are aware that they have the right to be assisted by an attorney or nonattorney representative, and, if no such person is present, that they have voluntarily waived that right. *Lamay*, 562 F.3d at 507; *see Robinson*, 733 F.2d at 257.

### IV. *Conclusion*

For the reasons set forth above, the Commissioner's motion for judgment on the

pleadings has been denied, and the case remanded pursuant to sentence four of section 405(g) of the Act for further proceedings consistent with this Memorandum Decision.

SO ORDERED.